IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

MELVIN MARGHEIM,

                   Plaintiff,                      CV-09-1184-SU

         v.                              OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                   Defendant.

SULLIVAN, Magistrate Judge:

## **INTRODUCTION**

     Plaintiff Melvin Margheim appeals the Commissioner's decision denying his applications

for disability insurance benefits and supplemental security income payments under Titles II and XVI

of the Social Security Act. The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The

parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case

in accordance with F.R.C.P. 73 and 28 U.S.C. § 636(c).   For the following reasons, the Commissioner's decision is affirmed.

Margheim alleged disability beginning September 1, 2001. Admin. R. 104, 859. He satisfied the insured status requirements of the Social Security Act through December 31, 2006.  *Id.* at 111A. He must establish that he was disabled on or before that date to prevail on his Title II claim.  42 U.S.C. § 423(a)(1)(A).  *See Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998).  There is no insured status requirement for his Title XVI claim.

The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  The ALJ found Margheim's ability to work significantly affected by depression and degenerative disc disease of the lumbar and cervical regions of the spine. Admin. R. 25.  She found Margheim's impairments did not satisfy the criteria for any of the presumptively disabling conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  Admin. R. 27.  She found he retained the residual functional capacity ("RFC") to perform a range of sedentary work with limitations described more fully below.  *Id.* at 28.  The ALJ elicited testimony from a vocational expert ("VE") with hypothetical questions based on Margheim's RFC.  *Id.* at 1018-20.  The VE testified that a person with Margheim's vocational factors and RFC could perform the requirements of unskilled sedentary occupations such as surveillance system monitor.  *Id.*  Based on the VE's testimony, the ALJ concluded that Margheim had failed to prove he was disabled within the meaning of the Social Security Act.  *Id.* at 37.

///

///

**STANDARD OF REVIEW**

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings of fact are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The factual findings must be upheld if supported by inferences reasonably drawn from the record and if evidence exists to support more than one rational interpretation, the court must defer to the factual findings in the Commissioner's decision. *Id.*; *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

**DISCUSSION**

**I.    Claims of Error**

Margheim contends the ALJ failed to assess his functional limitations accurately because she discounted the medical source statements of Gregory Allers, D.O., without providing a legally adequate explanation for doing so. Margheim challenges the ALJ's determination that his combined impairments did not satisfy the criteria for any presumptively disabling condition in the Listing of Impairments. Margheim also contends the ALJ relied on erroneous testimony from the VE in determining that he can perform jobs existing in the national economy.

**II.    Medical Source Statements**

Dr. Allers provided Margheim with primary care starting in or about 2000. At that time, before the alleged onset of disability, Margheim told Dr. Allers of back pain beginning in 1998 for which he had undergone diagnostic imaging. Margheim reported to Dr. Allers that he had four herniated discs that he was told were inoperable. Admin. R. 496. MRI studies performed in 1999 showed disc bulges of only questionable significance with mild central canal stenosis and facet

degenerative changes at L4-5. *Id.* at 538, 540. Through 2001, Dr. Allers provided routine care, such as removal of a skin tag, treatment of an injured elbow, and evaluation of chest tightness with shortness of breath. *Id.* at 490-92, 494-95. This was the extent of the treatment provided by Dr. Allers at the alleged onset of disability in September 2001.

In January 2002, Dr. Allers examined Margheim for back and foot pain after an alleged injury. Diagnostic imaging of Margheim's right foot did not reveal any fracture, dislocation, or soft tissue abnormality consistent with an injury. *Id.* at 487, 499. In April 2002, Dr. Allers examined Margheim for complaints of aching elbow joints with pain and weakness in both arms. Dr. Allers noted that Margheim did not have a decrease in muscle bulk in the upper extremities associated with his alleged weakness. *Id.* at 484.

In December 2002, Margheim sought treatment for lower back pain and a stiff neck. Margheim reported he could not rotate his head to the right due to pain. *Id.* at 473. MRI studies showed mild degenerative changes in the cervical spine with moderate left foraminal narrowing at one level. *Id.* at 497. Dr. Allers diagnosed degenerative disc disease and secondary situational depression. *Id.* at 468.

In April 2003, Margheim sought emergency treatment after falling from a ladder while cleaning his gutters, injuring his head, back, and neck. Visual inspection and physical examination were unremarkable except for diffuse tenderness. Diagnostic images showed degenerative changes in the cervical spine, but no acute condition. A CT of the head was negative. *Id.* at 413-14. Margheim was later confronted because climbing ladders and cleaning gutters appeared to be contrary to his allegations of debilitating limitations. Margheim then denied engaging in those

activities and said he had lied to emergency room personnel about the incident in an attempt to obtain coverage under his homeowners insurance policy. *Id.* at 245-46.

In July 2003, Kim Webster, M.D., reviewed the objective medical evidence and performed a consultative examination. Margheim's chief complaint was pain in the lower back with radiation into the legs. He described radiation in a pattern that Dr. Webster could not associate with an identifiable nerve-root dermatome. Dr. Webster indicated Margheim engaged in more pain behavior than any patient he had ever seen, but toward the end of the examination "calmed down and sat still and seemed to be fine." *Id.* at 379. Dr. Webster found Margheim's subjective reports inconsistent and noted that Margheim gave poor effort during the evaluation. *Id.*

In his physical examination, Dr. Webster made generally benign clinical findings, except Margheim demonstrated limited cervical and lumbar range of motion. He was able to reach, hold, grip and manipulate. He had no neurologic deficits and good muscle bulk, tone, and strength in the upper and lower extremities. Margheim demonstrated a lack of effort in strength testing to an extent that prevented an accurate diagnosis. Dr. Webster noted that Margheim's pain behavior "definitely was out of proportion of objective findings." *Id.* at 381-82.

In August 2003, after diagnostic imaging showed canal stenosis had developed in the lumbar spine, David Antezana, M.D., performed a lumbar decompressive and discectomy procedure. *Id.* at 480-81, 542, 770, 795. In November 2004, Dr. Antezana performed a bilateral microforaminotomy procedure to treat degenerative changes in the cervical spine. *Id.* at 477-78, 768. Margheim reported benefit from both procedures.

In 2005, Margheim complained of a recurrence or continuation of neck and back pain. Dr. Allers gave him trigger point injections, which helped somewhat with his neck pain. *Id.* at 792-95.

Dr. Allers did not record objective findings in his progress notes.  During 2006, Margheim continued

to report chronic neck and back pain and began to use an assistive device at times when walking.

*Id.* at 788-90.

In August 2006, Dr. Allers completed a questionnaire in support of Margheim's disability

claim.  The objective evidence supporting his diagnostic impression included MRI reports, a positive

straight leg raise test, abnormal gait, muscle spasm, and atrophy of the gluteal muscles.  In addition,

he relied on Margheim's subjective symptoms of chronic pain in the lower back radiating down both

legs, neck pain, fatigue, irritability, weakness, and impaired sleep.  Dr. Allers did not think

Margheim was malingering.  Admin. R. 522.

Dr. Allers opined that Margheim had impaired attention and concentration with medication

side effects of fatigue and irritability.  He believed Margheim could walk less than two blocks, sit

no more than 20 minutes at a time, and stand no more than five minutes at a time.  He opined that

Margheim needed to be able to walk around every 10 to 15 minutes for 10 minutes each time and

the option to sit, stand, or walk at will.  He needed unscheduled rest breaks every hour for 5 to 10

minutes.  Dr. Allers said Margheim could lift less than 10 pounds occasionally and could not engage

in any of the standard postural activities such as stooping, crouching, crawling, and so forth.  Dr.

Allers also indicated Margheim had severe limitations in handling, fingering, and reaching.  *Id.* at

522-37.

In January 2007, Tatsuro Ogisu, M.D., performed a comprehensive orthopedic examination.

Dr. Ogisu reviewed Margheim's medical history, objective findings, and surgical notes, conducted

a clinical interview, and performed a comprehensive physical examination.  He completed a Medical

Source Statement indicating the physical work-related activities Margheim could reasonably be

expected to perform. Dr. Ogisu opined Margheim could lift 10 pounds occasionally and five pounds frequently. He could stand or walk for a total of at least two hours in a workday and needed to alternate sitting and standing periodically to relieve pain or discomfort. He could push and pull light weight with the upper extremities but full extension of the right leg would be painful at times, limiting his ability to push with the right leg. He could not climb ladders, ropes, or scaffolds, but could occasionally perform other standard postural activities such as crawling, balancing, or crouching. He could reach overhead occasionally and had no limitations in handling, fingering, or feeling with his hands. He could not work in an environment exposing him to excessive vibration. *Id.* at 696-703.

In January 2007, Margheim underwent a neuropsychological screening evaluation by David Gostnell, Ph.D., to assess his alleged mental impairments. Dr. Gostnell performed a clinical interview, reviewed the medical records, and administered a battery of psychological tests. Margheim scored in a broad range of impairment on cognitive tests, including attention, concentration, tracking, memory, and learning. Dr. Gostnell interpreted these scores as invalid due to poor effort and motivation. Margheim's performance on the Test of Memory Malingering, was "well within the range that indicates inadequate effort and deliberate incorrect responding." *Id.* at 711. Margheim produced a generally valid personality profile, but his responses to certain items "were exaggerated, suggesting carelessness, random responses, or deliberate exaggeration." *Id.*

Dr. Gostnell concluded that Margheim's pain behavior suggested an extreme preoccupation with physical symptoms and disability. Neuropsychological testing could not be used for valid diagnostic purposes because of Margheim's exaggeration and lack of effort. Margheim's medical history did not present any basis to explain or predict the mental impairments suggested by his

scores. In any event, his test scores showed at least low average general intellectual functioning. Dr. Gostnell opined that Margheim's presentation at the evaluation was consistent with the observations of Dr. Webster and others that Margheim was embellishing symptoms. He was not sure whether Margheim was malingering (feigning symptoms for external gain), somatizing (transforming psychological problems into physical medical problems), or experiencing a factitious disorder (embellishment for satisfaction of psychological dependency needs). *Id.* at 709-12. Dr. Webster was not equivocal in his conclusion that Margheim was embellishing symptoms, however.

In February 2007, Dr. Allers wrote a letter in support of Margheim's disability claim. He indicated Margheim's back and neck were essentially fixed in position. Margheim was unable to bend down or straighten up due to lumbar pain and could not extend his neck or rotate it to the left. Dr. Allers had reduced his pain medication dosage due to side effects, presumably reducing the ameliorative effect. Dr. Allers reiterated that Margheim suffered from depression as a result of his physical limitations. *Id.* at 723.

At the hearing in March 2007, the ALJ took testimony from a medical expert, David Rullman, M.D. Dr. Rullman reviewed Margheim's medical records and concluded that Margheim had degenerative changes in his spine and a physiological dependence on opiates requiring him to take an enormous dose of Methadone. *Id.* at 999. He found some of the conditions Margheim complained of during the hearing unsupported by medical records. For example, Margheim testified that he had separated his shoulder, developed a growth on his ribs, and other conditions that were not reflected in the medical evidence. *Id.* at 1000. Dr. Rullman testified that Margheim's subjective reporting had been noted by other physicians to be colored by histrionic personality traits and he believed Margheim's testimony was also colored by that tendency. *Id.* at 1001.

Dr. Rullman observed that Margheim demonstrated significant range of motion of the cervical spine during the hearing, inconsistent with Dr. Allers's statement that the neck was essentially fixed in a single position.  He found no basis in the medical evidence to infer that Margheim would be better able to move his neck at some times than others.  With respect to limitations from degenerative disc disease and related arthritis, Dr. Rullman believed Margheim should have "a very modest amount of residual difficulty."  *Id.* at 1004.  Dr. Rullman found the limitations in Dr. Ogisu's examination reasonable.  *Id.* at 1005.  He agreed with Dr. Gostnell's statement that Margheim's pain was an interactive function of his physical condition, his anxiety, and his predisposition to somatization.  *Id.* at 1007.  Dr. Rullman observed that Margheim was "on so much opioid medication that as a physician, I don't understand how he could possibly have pain." *Id.* at 1010.  Nevertheless, Dr. Rullman was unwilling to conclude that Margheim was malingering or that he did not experience some level of pain.

In April 2007, Dr. Allers completed a questionnaire focused on identifying any functional limitations resulting from a potential somatoform disorder, apparently in response to references by Dr. Gostnell and Dr. Rullman regarding Margheim's predisposition to somatization.  Dr. Allers indicated Margheim had chronic low back pain and depression, but did not endorse a somatoform disorder. *Id.* at 837.  Dr. Allers indicated Margheim had depression secondary to chronic pain, but opined that his mental abilities would permit him to function well in a competitive work environment if he were physically able to do so.  *Id.* at 837-41.  Dr. Allers also reiterated his opinion of Margheim's physical limitations, generally consistent with his August 2006 questionnaire.  *Id.* at 842-43.

The ALJ had no quarrel with Dr. Allers's diagnoses of degenerative disc disease and depression. Admin. R. 25. She accepted that Margheim had some degree of the functional impairments Dr. Allers indicated, but did not accept his opinion regarding the severity of the functional impact of those impairments. *Id.* An ALJ can reject a physician's opinion that is inconsistent with the opinions of other physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002), quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Here, the ALJ found the functional limitations in the reports of Drs. Webster, Ogisu, Gostnell and the agency medical consultants inconsistent with Dr. Allers's opinion. Admin. R. 33-34. Accordingly, the ALJ was required to provide an explanation based on specific, legitimate reasons. *Thomas*, 278 F3d at 957.

The ALJ explained that Dr. Allers's opinion was inconsistent with the observations of other physicians. For example, Dr. Rullman observed during the hearing that Margheim demonstrated significant range of motion contrary to Dr. Allers's opinion that Margheim's neck and back were essentially fixed in one position. Dr. Rullman found nothing in the medical evidence providing a basis to infer that Margheim should be able to move more freely at some times than others. Admin. R. 33, 1003. Dr. Webster and Dr. Gostnell both observed that Margheim's pain behavior decreased with prolonged sitting, contrary to Dr. Allers's opinion that Margheim could not bear sitting for more than 20 minutes. *Id.* at 32-33, 379, 709. Indeed, Margheim remained seated throughout the entire 3-hour evaluation by Dr. Gostnell and appeared to experience a decrease in pain over that period. *Id.* at 709. Similarly, in their examinations, Drs. Ogisu and Webster found Margheim able to finger,

handle, and manipulate with the hands, contrary to Dr. Allers's opinion that Margheim had severe limitations in those activities.

The ALJ also noted that Dr. Allers's opinion was contradicted by Margheim's own testimony, in some respects. *Id.* at 33. For example, Dr. Allers opined that Margheim could never lift 10 pounds and could lift less than 10 pounds only rarely. *Id.* at 530. Margheim testified, however, that he could lift five pounds with his right hand and 20 pounds with his left. *Id.* at 983. Margheim's testimony was entirely consistent with the findings of Dr. Webster, that Margheim could lift 10 pounds occasionally and five pounds frequently. The ALJ reasonably incorporated those findings into her RFC assessment.

The ALJ did not give full weight to Dr. Allers's opinion regarding functional limitations from mental impairments. *Id.* at 34. The ALJ pointed out that Dr. Allers's opinion was internally inconsistent regarding limitations from mental impairments. For example, Dr. Allers indicated Margheim was "unlimited or very good" in all the specific mental abilities needed for unskilled, semiskilled, and skilled work, but found him moderately impaired in the broader categories of function comprised of those specific mental abilities. *Id.* at 839-41. In addition, Dr. Allers assigned a global assessment of functioning score consistent with serious impairment, despite finding Margheim unlimited in all the mental functions required for work. *Id.* at 837. Dr. Allers opined that Margheim would function well in a competitive work environment if he were physically able to do so. *Id.* at 840. The ALJ found Dr. Allers's opinion regarding functional limitations from mental impairments inconsistent with his own treatment records which indicated Margheim's depression was stable and controlled by medications. *Id.* at 34, 463, 660, 856.

The ALJ gave greater weight to the findings and conclusions of Dr. Gostnell and adopted the mental limitations identified in his report. The ALJ reasoned that Dr. Gostnell was trained as a psychologist, administered a battery of neuropsychological tests to support his opinion, and the opinion was squarely within his area of expertise. *Id.* at 34. In contrast, Dr. Allers is a general practitioner without special expertise in psychology, did not administer psychological testing, and based his opinion primarily on unreliable subjective reports from Margheim. *Id.* at 34. Under these circumstances, it was reasonable for the ALJ to give greater weight to Dr. Gostnell's findings.

Finally, the ALJ found Dr. Allers relied on Margheim's subjective statements about the severity of his pain and limitations in range of motion, which the ALJ found lacking in credibility. *Id.* Margheim does not challenge the ALJ's credibility determination. It is proper for an ALJ to reject a physician's opinion that is premised on the claimant's subjective statements which the ALJ finds unreliable; the physician's opinion is no more credible than the statements upon which it is based. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1228 n.8 (9th Cir. 2009).

In summary, the ALJ articulated specific, legitimate reasons for discounting Dr. Allers's opinion in favor of the opinions of Drs. Ogisu, Webster, and Gostnell. Margheim urges the court to substitute his interpretation of the evidence for that of the Commissioner. Because the ALJ's findings are based on inferences reasonably drawn from the record, the court may not substitute a different view of the evidence even if it is susceptible to more than one rational interpretation. *Andrews*, 53 F.3d at 1039.

///

///

III.    **Listing of Impairments**

The Commissioner acknowledges that certain conditions are so severe as to preclude substantial gainful activity.  If the medical evidence establishes that a claimant suffers from such a condition, the claimant will be  conclusively presumed to be disabled at step three of the regulatory decision-making procedure.  *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(d), 416.920(d). The criteria for each presumptively disabling condition are enumerated in the Listing of Impairments. The claimant must produce medical evidence establishing the symptoms, signs and laboratory findings specified for the listed impairment.  Social Security Ruling ("SSR") 86-8, 1986 WL 68636, *3.

Margheim challenges the ALJ's determination that his combined impairments did not satisfy the criteria for section 1.04A of the Listing of Impairments.  Listing 1.04A involves disorders of the spine resulting in compromise of a nerve root or the spinal cord.  It requires evidence of nerve root or spinal cord compression associated with neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight leg raising tests in both sitting and supine positions.  Listing of Impairments § 1.04A.

The ALJ accepted the presence of degenerative disc disease in the cervical and lumbar spine with some limitation in range of motion.  *Id.* at 27.  She found Margheim failed to prove the other criteria required to satisfy the listing.  *Id.*  This conclusion is supported by the objective medical findings in the record.  In July 2003, Dr. Webster found Margheim's alleged distribution of pain to be non-dermatomal, instead of the required neuro-anatomic distribution associated with nerve root compression.  *Id.* at 379.  Dr. Webster did not find the required motor loss, instead concluding Margheim had good muscle bulk, tone, and strength in both upper and lower extremities.  *Id.* at 381.

He found Margheim's sensation intact and reflexes normal. *Id.* In August 2003, an emergency room physician found Margheim's sensation intact, reflexes active, and straight-leg examinations negative. *Id.* at 584. In May 2005, an emergency room physician found Margheim had no motor, reflex, or sensory deficits. *Id.* at 591. In January 2007, Dr. Ogisu found generally normal sensory and reflex examinations with only slightly diminished motor strength. *Id.* at 699. Dr. Ogisu got a partially positive seated straight-leg raise test, but did not perform a supine test. *Id.* at 698.

Margheim relies on the questionnaire worksheet provided by Dr. Allers in August 2006. Dr. Allers marked the worksheet indicating Margheim had reflex changes and gluteal muscle atrophy and weakness. *Id.* at 523. The ALJ properly discounted Dr. Allers's opinion for the reasons discussed previously and reasonably chose to rely instead on the findings of Drs. Webster and Ogisu.

In addition, Dr. Allers did not describe the clinical basis of his conclusions regarding reflex changes or muscle weakness and atrophy. He indicated the clinical findings and objective test results he utilized were MRI reports and surgical notes. *Id.* at 522. The MRI reports and surgical notes, however, do not support the conclusion that Margheim suffered motor loss accompanied by sensory or reflex loss. An MRI study in 2003 showed probable impingement of the right L-5 nerve root. *Id.* at 429. This was treated surgically, however, and MRI studies after the surgery showed improvement with good decompression at L4-5 and L5-S1. *Id.* at 480-81, 697. The post-operative MRI reports showed "only mild to moderate canal stenosis with no clear nerve root impingement." *Id.* at 699. In any event, the MRI reports and surgical notes do not address motor loss or sensory and reflex deficits. In short, Dr. Allers's worksheet is unsupported regarding reflex changes, muscle weakness, and atrophy. An ALJ need not accept a physician's opinion that is conclusory in form and does not offer clinical or objective findings to support its conclusions. *Johnson v. Shalala*, 60 F.3d

1428, 1432 (9th Cir. 1995); *Batson*, 359 F.3d at 1195; *Meanal v. Apfel*, 172 F.3d 1111, 1117 (9th Cir. 1999).  Equivalence with the listing criteria must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques.  SSR 86-8, 1986 WL 68636, *4. Margheim has not produced such evidence.

Margheim argues that combining his mental impairments with his spinal condition shows the combination is equal in severity to Listing 1.04.  He argues the ALJ failed to explain adequately why his multiple impairments did not meet or equal the listing criteria.  However, Margheim failed to present a theory as to how his depression could substitute for the required nerve root impingement resulting in motor loss with sensory and reflex deficits required for the listing.  An ALJ is not required to discuss the combined effects of a claimant's impairments unless the claimant has proffered a plausible theory as to how the combined impairments satisfy the criteria for a listing. *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).

In summary, the ALJ's conclusion that Margheim has shown degenerative disc disease with some limitations in range of motion, but has failed to prove all the elements necessary to meet Listing 1.04A flows logically from the evidence in the record as a whole.  Accordingly, the court finds no error in the ALJ's step three analysis.

**IV.    Vocational Evidence**

At step five of the decision-making process, the Commissioner must show that jobs exist in the national economy that a person having the vocational factors and functional limitations of the claimant can perform.  *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). The ALJ can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the limitations of the claimant.  *Andrews*, 53 F3d at 1043.

Here, the ALJ elicited testimony from the VE based on hypothetical questions reflecting Margheim's RFC.  Admin. R. 1018-20.  The VE testified that a hypothetical person with Margheim's age, education, work experience, and RFC could perform the work requirements of the sedentary, unskilled occupation surveillance system monitor, which represents thousands of jobs in the national economy.  *Id.* at 1020.

Margheim challenges the Commissioner's reliance on the description of the surveillance system monitor occupation in the Department of Labor publication *Dictionary of Occupational Titles* ("DOT").  For information about the requirements of work, the Commissioner relies primarily on the DOT.  SSR 00-4p, 2000 WL 1898704; *Carmickle v. Comm'r Soc. Sec. Admin.* 533 F.3d 1155, 1166 (9th Cir. 2008).  A VE's testimony may be used to supplement the information in the DOT or to provide more specificity about the requirements of a particular job as it is performed in a particular setting.  *Id.*  If testimony provided by a VE is inconsistent with information in the DOT, however, the ALJ must resolve the conflict and explain its resolution.  *Id; Massachi v. Astrue,* 486 F.3d 1149, 1152 (9th Cir. 2007).   An ALJ may deviate from the DOT based on VE testimony, but only if the record contains persuasive evidence to support the deviation.  *Johnson*, 60 F.3d at 1435.

Despite these well established principles, Margheim urges the court to disregard the DOT description of the requirements of work as a surveillance system monitor.  Margheim argues that the job requirements have evolved since the terrorist attacks of September 11, 2001, and that the DOT information is no longer accurate.  He contends it is common knowledge that the occupation now requires constant vigilance and constant movement of the head back and forth, even though these requirements are not contained in the DOT description. *See* DOT, 379.367-010, 1991 WL 673244. Margheim offers no authority for this proposition.  He had the opportunity at the hearing to inquire

of the VE regarding the current job requirements for this occupation, but did not.  Accordingly, there is neither VE testimony nor persuasive evidence in the record to support a deviation from the information in the DOT.

Margheim contends the ALJ could have relied on other sources of vocational information, but cites no such source supporting his claim that the occupation of surveillance system monitor has new job requirements which he cannot perform.  Accordingly, the court is unpersuaded by his argument.

Finally, Margheim argues that the ALJ elicited testimony from the VE with a hypothetical question that did not accurately reflect his mental impairments.  The ALJ adopted findings of Dr. Gostnell which were provided on a standard agency form.  Margheim takes issue with the definition of "moderate" used in the instructions on the standard form.  The instructions direct the physician to rate the patient's degree of impairment in each of a number of work-related activities.  The physician may choose among five levels of impairment ranging from "none" to "extreme" where "moderate" is the middle level of impairment.  Admin R. 717.  The instructions on the form define moderate impairment to mean "a moderate limitation in this area but the individual is still able to function satisfactorily." *Id.*  Dr. Gostnell rated Margheim's level of impairment in 10 specific activities and gave no indication that the definitions were unclear or prevented him from accurately stating his opinion.

Margheim argues that the definition required Dr. Gostnell to express a vocational opinion about job performance, instead of a psychological opinion about his functional limitations.  This argument is not persuasive, because the definition refers to specific work-related mental functions, such as, understanding simple instructions and making simple work-related decisions.  Medical

opinions include such statements about what a claimant can still do despite his impairments. 20 C.F.R. §§ 404.1527(a), 416.927(a). The form did not require Dr. Gostnell to opine regarding whether Margheim could work, whether he could engage in a particular occupation, or whether a moderate level of impairment would be tolerated by employers in specific occupations. Such opinions would be vocational and beyond Dr. Gostnell's expertise. Dr. Gostnell's opinion was limited to Margheim's level of impairment in specific work-related mental activities. As such, the ALJ properly accepted it as a medical opinion.

In summary, Margheim's challenges to the vocational evidence cannot be sustained.

## CONCLUSION

The Commissioner's decision is based on proper legal standards and the findings of fact are supported by substantial evidence in the record as a whole. Under these circumstances, the court must affirm the Commissioner. 42 U.S.C. § 405(g); *Batson,* 359 F.3d at 1193; *Andrews,* 53 F.3d at 1039-40.

## ORDER

For the foregoing reasons, the Commissioner's decision is affirmed.

DATED this 2nd day of March, 2011.

/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge

18 - OPINION AND ORDER